## Cook vs. Eaton.

Neither at law nor in equity can parol evidence be received, to show that a deed or assignment absolute on its face was agreed to be, or was, a mortgage, when the parties intended that the instrument should be in the form in which it is.

But where there is an agreement to execute a defeasance, or that a mortgage shall be given, and by fraud, accident or mistake, that agreement is not carried out, equity will give relief, and must necessarily allow parol evidence, to prove the agreement, and the fraud, accident or mistake.

This was an appeal by the defendant from orders made at a special term, granting and continuing an injunction. The facts are set forth in the opinion of the court.

*By the Court*, MITCHELL, J. The complaint in this cause alleged that a lease was held by one Howland, under a parol agreement, as security to Howland for money due to him by the plaintiff, and then for the benefit of the plaintiff; that Howland received the amount due to him, and assigned the lease to the Eagle Fire Company to be held by like parol agreement as security to the company, and then for the benefit of the plaintiff; that the plaintiff arranged verbally with the defendant Eaton that he, Eaton, should take an assignment of the lease, absolute on its face, and give his bond and mortgage to the company for the amount due to it, and should also from time to time advance moneys to him as he should need them, and that Eaton should hold the lease as security for the advances, and then for the benefit of Cook the plaintiff. That the assignment was accordingly executed to Cook, absolute in its form, pursuant to the agreement between the parties, although it was intended to be a security only. The plaintiff, in two affidavits re-affirms these statements; but the allegations acquire no additional force by repetition. The defendant as positively denies that there was any understanding that he should hold the lease as security, and says, the assignment was made absolute in its form, and was intended to be an absolute sale to him. Without any power in the court to perceive that one party is entitled to more credit than the other, the affidavits of the plaintiff and defendant must

be regarded as neutralizing each other, and each must be disregarded, so far as it contradicts the other.

Some time after the assignment was executed, the defendant executed a lease of the premises to the plaintiff, for one year from May 1st, then next, at $2000 a year, and the plaintiff executed a counterpart to the defendant. The plaintiff says this was executed under the representation of the defendant that it would not alter their relations between each other, and that the defendant would give the plaintiff a writing to that effect. This representation and promise the defendant denies, and there is no proof of its truth. After the lease was executed the plaintiff was written to, to pay the rent, and proceedings to eject his under-tenants were commenced, and he came forward and paid to the defendant's attorney something on account. He says he refused to pay it as rent. He produces no proof of this, and the attorney who received the money says it was paid as rent. Leaving out the contradictions thus far, and the evidence would be that an assignment was executed to the defendant; that it was intended to be absolute in its form, and that it was in form an absolute sale; that the defendant, treating it as absolute, executed a lease of the premises to the plaintiff, who executed a counterpart of the lease; that the plaintiff's under-tenants were proceeded against for the nonpayment of the rent, and that the plaintiff then came forward and paid part of the amount claimed. Of these facts there is no doubt. They all indicate an absolute ownership in the defendant, and they are in writing, except the act of payment, which is as strong as a writing. The burthen of nullifying them is therefore properly thrown on the plaintiff, and it must require strong and clear proof to do this. His affidavit, as before stated, can avail nothing, being contradicted by that of the defendant.

The plaintiff relies in part on the fact that Howard, and afterwards the Eagle Company, held the lease for his benefit, although under an assignment absolute in its form. But it would be the most dangerous rule of evidence to allow a party to treat an assignment as a mortgage only, which was absolute on its face, because former parties had so held assignments of the same,

property for him; when, as in this case, further sums were advanced to the person for whose benefit the lease had been held, and the assignor did not merely assign the lease but took a new bond and mortgage from the assignee, for all that was due to the assignor, and the former beneficiary did an act so inconsistent with a mortgage as to accept a lease of the premises, and agree to pay rent for them, and also executed a separate absolute assignment of the lease with the consideration of $600, subject to the mortgage to the company, expressed in it. It would be different if there were no act except a simple assignment by the former assignee, who held in trust.

The plaintiff also showed that he had always placed a high value on this property, and had had a standing offer for it of more than the amount of the consideration which the defendant says he was to pay, and which was expressed in the assignment by Cook. The acts of the plaintiff, which may have been unknown to the defendant, can be no evidence against the defendant. The question is not what the plaintiff may have wished or thought he could do, or what price he could in fact get for the premises, but what he and the defendant agreed between themselves. He might have told the defendant that others would give him more, and that he valued the property as worth more and had never been willing to sell it at so small a price, and yet ended with selling it to him for the price stated. So the fact that George Curtis had agreed to be assignee in trust, in place of the company, and to give his bond and mortgage to the company without advancing any thing to Mr. Cook, is no evidence that Mr. Cook did not afterwards agree to sell absolutely to Eaton for $6000 advance on the mortgage. This brings us to the material evidence on this question of fact.

Mr. Sanxay says that *before* the assignment was executed, the defendant said he had agreed to help the plaintiff through his embarrassments, by lending him money enough to get him through, and that he was to take an assignment of the lease as his security for his advances, and to hold it as a security; that the defendant inquired how much the plaintiff would require to carry him through; that Mr. Sanxay mentioned the amount,

and the defendant said he was willing to advance that, and more, &c.; and that he had already advanced considerable money to the plaintiff, which the plaintiff owed him, and that it also was to be secured by the assignment; and that the plaintiff would be able in a couple of years, to retrieve his affairs completely and take up the assignment of the lease. That after this, Eaton met Sanxay in Broadway and said he was inconvenienced by his undertaking to advance money to Cook, and had already advanced to him several thousand dollars, and requested Sanxay to see if Mr. Curtis would not take his place and reimburse him, or see Cook and endeavor to get some one to pay him off and take up the lease.

Mr. Hillyer says that in the fall of 1851, he met Eaton in Wall-street; that Eaton said that Cook owed him a considerable sum, and that he thought of suing him, and getting a judgment against him. This is the language which would be used by one to whom an unsecured debt was due. If Eaton considered the assignment held by him was a security, and in the nature of a mortgage, and referred to the debt secured by it, he would not say that he would *sue* on the debt and get a judgment for it; but that he would foreclose the mortgage or security which he held. Eaton then claimed that he had advanced Cook money beyond the consideration for the loan. Eaton also said that Cook did not pay the rent upon his lease. This, in connection with what was previously, said would mean the rent on the lease from Eaton to Cook. Hillyer understood that this referred to the ground rent; but Eaton's rights are not to be affected by any one's understanding of what he said, but by what he said in fact. In conformity with this, Eaton said to Hillyer "why don't you know that the property is *now* held by me?" On Hillyer's answering in the negative, he says that Eaton replied he had been making advances to Cook, and had assumed liabilities for him, and held the lease for his security for said debts and liabilities, and for Cook's benefit.

This is the whole evidence of the plaintiff to countervail two written instruments executed by him, and which are entirely contradictory of these two parol statements, so far as the parol

Cook *v.* Eaton.

statements favor the plaintiff. Such evidence ought not to be received to contradict written evidence, if it is admissible at all. Both Sanxay and Hillyer may easily have misunderstood what Eaton said. In all probability neither would profess to give his words. What Eaton said to Sanxay *before* the assignment was executed, may have been changed by a subsequent agreement before the assignment was executed.

The plaintiff also introduced the evidence of Mr. Wells, the president *pro tem.* of the Eagle Company, that he *understood* the assignment to Eaton was to be by way of security. This is no evidence, and if it were, it is balanced by the evidence of Mr. Morris, the secretary of the company, who understood from all that Cook and Eaton said and did, that Cook sold to Eaton, and that Eaton purchased, the lease absolutely and unqualifiedly. Mr. Stafford was of the same impression with Mr. Wells, and states that when he handed to Eaton the bill for drawing the papers on the assignment, Eaton said he would have to charge the bill to Cook. Part of the charges certainly would be payable by Cook, even if the transfer were absolute; and it would be not improbable that Eaton and Cook would both think that all should be charged to Cook; especially as the sale was at the solicitation of Cook and to benefit him.

On the other hand, Bloodgood, who was in Eaton's office, says that he understood, both from the statements of Cook and Eaton, that the sale was absolute; that Cook repeatedly afterwards told him that Eaton owned the premises, and had offered to purchase the lease of Eaton; that Eaton often asked Cook for money due to him from Cook, for rent, and Cook promised to pay it, and did once pay Eaton rent in his (Bloodgood's) presence. Townsend also (Eaton's attorney) says that Cook paid him $100 on account, and that according to his best recollection he gave to Cook a receipt as for rent, and that Cook paid it as so much rent due; and that afterwards Cook paid $146, in the same way. He also says that on one occasion Cook offered to purchase the lease of Eaton, who expressed a willingness to sell to him; and that at another time Cook offered to pay Eaton $25,000 for the premises.

This evidence, supported as it is by the written evidence, is too strong to be overcome by the testimony produced by the plaintiff. If an instrument, absolute on its face, can be converted into a mortgage, by parol evidence that it was intended to be held as a mortgage only, the evidence should be at least as strong as that which would justify the reforming of an instrument which had been drawn in a form contrary to the intention of the parties. There is no such evidence here, and the injunction should therefore be dissolved, with costs below and on appeal.

The question however will probably come up in some shape, in this case, or between these parties, whether parol evidence is admissible in equity, to show that the deed or assignment, absolute on its face, was agreed to be held as a mortgage. It is unquestionably settled by the decision of the court for the correction of errors in *Webb* v. *Rice*, (6 *Hill*, 219,) that such evidence cannot be admitted at law; but it is contended that it is still admissible in equity. Previous to this decision it had been repeatedly said, both at law and in equity, that a deed, though absolute on its face, might by parol evidence be shown to have been in fact a mortgage, and that this point was so well settled that it had ceased to be a subject of contest. (*Swart* v. *Service*, 21 *Wend.* 36. *Whittick* v. *Kane*, 1 *Paige*, 206. *Per Ch. J. Savage*, in *Clark* v. *Henry*, 2 *Cow.* 329. *Van Buren* v. *Olmstead*, 5 *Paige*, 10. *Walton* v. *Cronly*, 14 *Wend.* 63. *Slee* v. *Manhattan Co.*, 1 *Paige*, 77. *Baxter* v. *Wiley*, 9 *Verm. Rep.* 280. *Wright* v. *Bates*, 13 *id.* 347. *McIntyre* v. *Humphrey*, 1 *Hoff. Ch. Rep.* 31.) And decisions in both courts had been made, conformably to these dicta. In *Webb* v. *Rice, and Swart* v. *Service*, the supreme court yielded to the prior decisions on account of their authority, but pronounced them inconsistent with principle. When therefore the court of last resort reversed the judgment of the supreme court in *Webb* v. *Rice*, and excluded such evidence, it meant to restore the law to correct principles, and to overthrow all previous authorities, whether at law or in equity, that were inconsistent with such principles. The question is, is it consistent with sound principle to allow evidence to show that a deed absolute on its face was by parol

Cook *v.* Eaton.

agreement converted into a mortgage? The objection made both by Justices Cowen and Bronson was to its admission both in equity and law; and they took the distinction which would reconcile most of the cases, that when an instrument in the nature of a mortgage was intended to be executed, but by fraud, accident or mistake, it was drawn in an absolute form, equity could interpose and reform the deed, under one of its acknowledged heads of peculiar jurisdiction, and in exercising that jurisdiction would necessarily admit parol proof to show the fraud, accident or mistake: but that when there was no fraud, accident or mistake, the evidence could not, consistently with principle, be admitted in either court. Justice Cowen said, speaking of the authorities allowing this evidence, "For one, I was always at a loss to see on what principle the doctrine could be rested, *either at law or in equity*, unless fraud or mistake were shown in obtaining an absolute deed, when it should have been a mortgage. Short of that, the evidence is a direct contradiction of the deed; and I am not aware that it has ever been allowed in any other courts of equity or law." (*Swart* v. *Service*, 21 *Wend.* 38.) Justice Bronson said in the same case, "Where the transaction was intended as a mortgage, and through *fraud or mistake* the conveyance has been made absolute in its form, a court of equity, acting upon well established principles, can reform the deed. But this will only be done on a direct and appropriate proceeding for that purpose." (*Id. p.* 39.) He repeated the same opinion in *Webb* v. *Rice*, (1 *Hill*, 608,) and stated that his brethren, (Nelson and Cowen) agreed with him *in principle.* In the court for the correction of errors, in this last case, (6 *Hill*, 219,) Senator Bockee expressed his full concurrence in the views of Justice Bronson, and placed his decision on the ground that to admit the evidence would be to allow parol evidence to vary the terms of a written instrument, which was contrary to reason and authority, and that the only cases in which such evidence was admissible were "exceptions to the rule, viz. cases of accident, fraud or mistake, which were of chancery jurisdiction; and that it was only in those specified cases, that parol evidence could be received *even in a court of*

*equity*." He quotes the language of Chancellor Kent in *Stevens* v. *Cooper*, (1 *John. Ch. Rep.* 429,) that "the rules of evidence on this, as on most other points, are the same in courts of law and of equity." The chancellor also says in *Movan* v. *Hays*, (1 *John. Ch. Rep.* 343,) the rule is well established *in this* court, as well as at law, that parol evidence is inadmissible to disannul or substantially vary a written agreement, except upon the ground of mistake or fraud. And on principle the rules must be the same as to the admissibility of evidence; for otherwise a head of equity as yet unknown would arise, and a party having a cause of action at law, and of which the courts of law had full cognizance, might come into equity merely to have parol evidence admitted when a court of law would exclude it. He may come to examine the opposite party, but that is on the *established* principle that equity will compel a discovery. Senator Foster was opposed to the admission of the evidence in a court of law, but would not express any opinion whether that "case was one in which the defendants might have relief in a court of equity." Senator Putnam gave an opinion in favor of this evidence, but rested that opinion on previous authorities and the practice under them; and admitted "that the receiving of such evidence constitutes a somewhat *striking exception* to the general rule." He thus recognized the fact that the admission of such evidence was against principle.

Before the case of *Webb* v. *Rice* had been decided in the court for the correction of errors, the very learned and much lamented Vice Chancellor Sandford expressed his opinion very strongly against the propriety of such evidence. He says, "our courts have proceeded far beyond the courts of any other state or country in which the common law prevails, in the admission of parol evidence to invalidate contracts in writing and under seal;" and that it was not for him to extend the "dangerous innovation," and referring to the case of *Swart* v. *Service* he adds, that "in the last reported case at law to which he had been referred, one of the ablest judges that ever adorned our bench dissented from the opinion of his brethren; while the latter avowedly acted upon prior adjudications, against their own con-

Cook v. Eaton.

victions of the impropriety of the evidence." ( *Russell* v. *Kinney*, 1 *Sandf. Ch. Rep.* 37.) These remarks, thus strongly expressed by the vice chancellor sitting in a court of equity, can leave no doubt that after the decision of *Webb* v. *Rice* in the highest court of the state, he would have considered the courts relieved from the dangerous innovation, both at law and in equity.

The evidence offered in *Webb* v. *Rice* was excluded in our highest court, because to admit it would allow parol evidence, to contradict or vary a deed, contrary to an acknowledged rule of evidence. That rule of evidence prevails equally in equity and at law. It follows then, that the party offering such evidence cannot succeed unless he shows a case for the peculiar interference of a court of equity on some of its acknowledged heads of equity. Proof merely that there was a loan agreed to be made, and that afterwards an absolute deed was executed, would not show this equity; for the parties may have changed their minds and agreed to make the transaction a sale instead of a loan, and the deed would be strong evidence of such change. Proof that when the deed was executed they agreed it should be held as a mortgage would be to vary the effect of the deed, and so inadmissible. If they agreed that there should be a loan, and an absolute deed be given without any defeasance, then the deed is precisely what the parties intended it should be. There is no fraud, accident or mistake in its form, and chancery cannot therefore reform it. It is in this like *Hunt* v. *Rousmanier's Admrs*, (1 *Peters' R.* 13,) where Hunt loaned money to Rousmanier, who offered to give a mortgage on his share of a ship as security; but Hunt, under the advice of counsel preferred a power of attorney to him to sell the share of the vessel. Rousmanier died before the power of attorney was executed, and with his death the power expired. Then Hunt applied to the court to compel the administrators of Rousmanier to join in a sale of the share of the vessel. But the court refused; although it was evident that the intent of both parties was to secure the payment of the loan by a lien on the vessel, and that in the event which had occurred that intent was frustrated, yet that the instrument to effect that intent was executed precisely as both parties

intended it should be, and therefore the court could not interfere. So in the cases before supposed, the absolute deed is what both parties intended it should be, and there is therefore no fraud in using it with the effect which the law gives to it. The grantor in these cases may have had his motive in producing this legal effect. It might have been to conceal his interest in the property from his creditors, and then he must abide the result of his intended fraud; or it might have been to save himself from liability if the property fell in value, and to exempt himself from any personal liability, in any event; or to save the expense of a foreclosure; or to procure money on an instrument unimpeachable for usury. Then he intended to convey the property as he has done, and he confided that the grantee would execute the *secret trust* that existed between them and reconvey to him when the other purposes of the trust should be accomplished. To attempt to vary that conveyance is to set up a trust contrary to the statute, which declares that "no trust concerning lands can be created or declared unless by act or operation of law, or by a deed or conveyance in writing." (2 *R. S.* 134, § 6. *And see* 1 *Hill,* 608; 6 *Id.* 220.)

But if the lender took advantage of the borrower, in the *execution* of the instrument, a different rule would prevail. Then there would be such a fraud as a court of equity would have cognizance of, and would relieve against; as if the parties had agreed that the mode of security should be by an absolute deed by the lender and a defeasance by the borrower and the lender should refuse to execute the defeasance; or the borrower were an ignorant man and the lender should deceive him, and represent to him that the deed could only operate as a mortgage, or was a mortgage in fact, and the deception should be clearly made out, the withholding of the defeasance, in the first case, and the deception in the other, would be a fraud which a court of equity would not allow to be successfully practiced. This distinction was recognized in *Montacute* v. *Maxwell,* (1 *Prec. in Ch.* 5261;) *P. Wms.* 618; *Walker* v. *Walker,* (2 *Atk.* 98;) *Young* v. *Peachy,* (2 *Id.* 258;) *Joynes* v. *Staham,* (3 *Id.* 389;) *Dixon* v. *Parker,* (2 *Ves. sen.* 225.)

Cook v. Eaton.

In *Imham* v. *Child*, (1 *Brown's Ch. Cas.* 92,) the bill showed that on the plaintiff's granting an annuity, it was agreed that he should have the right to redeem it, but that the agreement was omitted; not from accident, fraud, or mistake of facts, but through fear that it might render the transaction usurious. The bill was dismissed, as the instrument contained what the parties intended it should contain. The Lord Chancellor, (Thurlow,) said, in substance, that if the agreement was that the right to redeem should not be inserted, the parol evidence could not be received; but if it was intended to be inserted, but was suppressed by fraud, he could not refuse to hear the evidence. And with this view he heard the evidence. (*See also* 1 *Ves. jun.* 241–3.) A like decision was made, refusing evidence of a parol agreement to *redeem* an *annuity*, in *Hare* v. *Shearwood*, (3 *Bro. C. C.* 178,) and the principle of both decisions was approved by Lord Eldon in *Townsend* v. *Stargroom*, (6 *Ves.* 333,) and by Chancellor Kent in *Movan* v. *Hays*, (1 *John. Ch. R.* 343.)

There is no difference between an absolute grant of an annuity with a right in the grantor to redeem it, and an absolute deed of lands with a right in the grantor to redeem. Each is in effect a mortgage, and if parol evidence should be received in the one case it should be in the other. Lord Eldon said "*Lord Imham* v. *Child* went upon an *indisputably* clear principle, that the parties did not mean to *insert in the agreement* a provision for redemption, because they are all of one mind, that it would be usurious; and they desired the court not to do what they intended, (for the insertion of that provision was directly *contrary to their intention*,) but they desired to be put in the same situation as if they had been better informed and consequently had a contrary intention. The answer is, they admit it was not to be in the deed; and why was the court to insert it, when two risks had occurred to the parties—the danger of usury, and the danger of trusting to the honor of the party." At page 338 of the same case he says, "Lord Rosslyn expressly takes the distinction between a person coming into this court desiring that a *new term* shall be introduced into an agreement, and a person ad-

mitting the agreement, but resisting the execution of it by making out a case of surprise." As to the effect of evidence in such a case, he says, (as Chancellor Kent said, in substance, in *Lyman* v. *United Ins. Co.* 2 *John. Ch. R.* 632,) that "those producing evidence of mistake or surprise, either to rectify an agreement, or calling upon the court to refuse a specific performance, undertake a case of great difficulty." Chancellor Kent says "the mistake is to be made out in the most clear and decided manner and to the entire satisfaction of the court."

Several of the decisions on this point seem to have arisen from a mistake as to the facts in prior cases. In *Whittick* v. *Kane,* (1 *Paige,* 202, 6,) Chancellor Walworth considers the law admitting the evidence as settled "since the decision of the case of *Clark* v. *Henry* in the court of errors, (2 *Cowen,* 324.)" Yet in the case referred to, there was in fact an agreement in writing to "sell" or retransfer the assignment of the mortgage on repayment of a certain sum, and neither Chancellor Kent nor his decision, (*p.* 326–7,) nor Justice Woodworth, said any thing about the admissibility of such evidence, but Ch. J. Savage only; and he relied on *Dey* v. *Dunham,* and *Peterson* v. *Clark.* In *Dey* v. *Dunham,* (2 *John. Ch.* 189,) and in *Peterson* v. *Clark,* ( 15 *John.* 205,) there was a written defeasance. Thus the dictum of Ch. J. Savage (which Chancellor Walworth considered as establishing the law) was not essential to the decision of the case before him, and was not supported by the cases on which he relied.

In several other cases there was a defeasance, or the answer made admissions which concluded the defendant. In *Strong* v. *Stewart,* (4 *John. Ch. Rep.* 167,) the defendant admitted in his answer that after the assignment he gave the assignor time to *return the money* and take back the assignment. This might be deemed an admission in writing of *facts* sufficient to constitute a mortgage, whatever other denials were made in the answer. In *Moses* v. *Murgatroyd,* (1 *John. Ch. Rep.* 128,) the answer admitted that the deed was taken as security only. In *Marks* v. *Pell,* (1 *John. Ch.* 594,) it was alleged in the bill and answer that a defeasance had been executed, but was destroyed

by fraud. In *Henry* v. *Davis*, (7 *John. Ch.* 40,) the agreement to re-assign was in writing. *Brown* v. *Dean*, (3 *Wend.* 208, 213,) is as to another point, but refers to a *written defeasance. Baxter* v. *Wiley*, (9 *Verm. Rep.* 276,) while it clearly adopts the rule admitting the parol evidence, yet held the instrument was not a mortgage, but a sale. *Wright* v. *Bates*, (13 *Verm. Rep.* 341,) contains also the same doctrine. But the bill there alleged that there had been an agreement to give a defeasance when the deed was executed. It is probable that the proof did not sustain this allegation, as the decision was not put on that ground.

In Kentucky, the chancellor had held (in 1830) that if the real transaction was a borrowing and lending, in whatever way that should appear it would be deemed a mortgage. (*Edrington* v. *Harper*, 3 *J. J. Marsh.* 355.) And the same point must again have been decided by the chancellor in the subsequent case of *Thomas* v. *McCormack*. But this last case, and the whole doctrine of it was reversed in the court of appeals in that state, in 1839, (9 *Dana.* 108,) in a very able opinion, showing that parol evidence cannot be received, at law or in equity, in such a case, unless there be proof of fraud or mistake in the execution of the conveyance, or some vice in the consideration. The court added, " The deed prescribed by the parties themselves as the highest evidence of their intentions, clearly imports that they intended an absolute sale." Yet the case of *Edrington* v. *Hays*, thus in effect overruled by *Thomas* v. *McCormack*, has been quoted as showing the law in Kentucky ; and the proposition has been maintained that the fraud of setting up, as absolute, a deed, long after it was executed, which the parties had verbally agreed should be a mortgage, was a " fraud in the *execution* of the conveyance, or a vice in the consideration." (12 *Peters*, 148.) These terms ought to be deemed so familiar as not to admit a doubt of their meaning. " Fraud in the execution" is fraud at the time of the execution, and cannot be alleged in a case where the execution is precisely what both parties intended, but one party afterwards uses the instrument contrary to a secret intent of theirs. " Vice in the consideration," is some

fault or illegality in the consideration of the contract or deed, but cannot be alleged when there is a valuable consideration and the deed such as was intended, and the only *vice* is in the subsequent unfair use of the deed.

· In the supreme court of the United States the parol evidence · has been received in such cases, and it is said to be the doctrine of that court that when it is "proved that a loan on security was really intended, the instrument given for that purpose is a mortgage, although absolute on its face. And this doctrine was applied even to the case of a deed thus executed, of lands in Kentucky, notwithstanding the decision in *Thomas* v. *McCormack.* The supreme court said, in the case referred to (*Russell* v. *Southard,* 12 *How.* 147,) that "if a different rule were held by the highest court of equity in Kentucky, the United States court would not feel bound thereby; that this being a suit in equity, and oral evidence being admitted or rejected, not by the mere force of any state statute, but upon the principles of general equity jurisprudence, the United States court must be governed by its own views of those principles." (*See also* 1 *How.* 127, *Morris* v. *Ex'rs of Nixon.*) This case does not allude to the decision in *Webb* v. *Rice.* It professes to be founded on the peculiar views of evidence governing the United States courts, and to disregard the authority of the state courts. On the same principle it can be of no authority in the state courts, which are entitled to their views of the rules of evidence. But that case admits that the United States courts should be governed by the statute law of the state. Every state probably has its statute of frauds against trusts to be created by parol, and the admission of this evidence is adjudged in our state to be against that statute, as well as against the general rules of evidence. Congress has no power to determine what evidence, writings or facts, shall constitute a mortgage on lands. Each state has this power as to lands within its own limits, and the exclusive power; and when the state by its written constitution adopts the common law, and a system of equity as administered and to be administered by its own courts, that common law and that system of equity are of as great authority as if the same law had been

written in a statute. The common law, the equity system, and the statute law, equally depend on the constitution, which gives equal force to each, while it is unrepealed. It is difficult then to conceive why the United States court should hesitate to conform its decisions to those of the state courts in such cases; the state having the exclusive power of legislation over those subjects, and Congress none. The United States court, by analogy has no power to adopt any rule except such as the state may sanction. The worst confusion may follow if two contrary systems are thus to prevail; especially as a party may give jurisdiction in his case to the United States court by going into another state, to reside there, although it be only for the purpose of suing in the United States courts. The result then would be, that as the parties happened to sue in the United States court or in a state court, so would the instrument be an absolute deed or a mortgage. The state courts have freely yielded to the authority of the United States court, where it had peculiar jurisdiction, or a right to decide on appeal, and the decision of the United States courts should not be allowed to interfere with the state courts when the state alone has power to legislate.

There are some other decisions at law, prior to *Webb* v. *Rice,* which ought to be noticed. Those which were inconsistent with the last case of course are overruled; but some which at first might seem inconsistent with it may be sustained. Where there is the relationship of landlord and tenant, and one enters under the tenant, reaping all the profits of the land that the tenant could reap, as he has all the benefits of the tenancy, so he should be subject to the burthen of the tenancy. Accordingly, a mortgagee of a lease in possession, should pay the rent; and on the other hand, although one who is assignee of the lessee is entitled to the possession of the land and the benefits of the lease and subject to its burthens, yet if he has not the possession, and by agreement between him and another that other holds the possession, and receives all the benefits of the lease, that other, and not he, should pay the rent. The question therefore, when the landlord sues for his rent, is, who in fact had the possession, and

the benefit of the lease, rather than what was the agreement between the lessee and the person claiming under him.  In this way, it is comparatively immaterial in an action by the landlord, or so far as he is concerned, what is the agreement between the lessee and his assigns.  A similar principle applies when a person furnishes materials to a ship.  He is considered as furnishing them to the one who has the control of the vessel, whether that control be given by writing or by parol.  Accordingly, in *Champlin* v. *Butler*, (18 *John.* 169,) where the captain sued for wages, the defendant was allowed to show that he never entered into possession, and that an assignment made to him, though absolute on its face, was intended only as a mortgage.  The like decision was made in *Ring* v. *Franklin*, (2 *Hall*, 1.)  In *Walton* v. *Cronly*, (14 *Wend.* 63,) the defendant, who was sued for rent due, was allowed to show that he was not in possession, and that the assignment to him was only by way of security.

Since the decision in *Webb* v. *Rice* there have been four decisions in the supreme court of this state, two of them in equity and two at law, conforming to that case.  In *Rathbun* v. *Rathbun*, (6 *Barb.* 98,) a son made an absolute conveyance to his father, and it was held that parol evidence could not be received *in equity*, to engraft on it a trust to pay certain debts and then to pay the balance to the son ; and *Webb* v. *Rice* was relied on.  In *Tyler* v. *Taylor*, (8 *Id.* 585,) in trover for a horse, it was held that parol evidence could not be received to show that an absolute assignment of a mortgage was made only for the purpose of having the mortgage satisfied, without showing some other fact than the mere error in the assignment, and without any offer to show that the error was fraudulent.  In *Taylor* v. *Baldwin*, (10 *Id.* 582,) on a claim to surplus moneys after foreclosure of a mortgage, it was conceded that parol evidence could not be received *at law*, to show that a subsequent deed absolute on its face was intended as a mortgage, but it was contended that a different rule prevailed in equity.  But the court said, (at page 586,) " On most points, the rules of evidence are .the same in courts of law and *equity* ; and the doctrine of both courts is the same as to the exclusion of parol evidence to contradict,

Cook *v.* Eaton.

or substantially vary, the legal import of a written agreement. It is true that equity exercises a jurisdiction to qualify, correct and reform deeds and other written instruments in cases of *accident, mistake* or *fraud.* These are well known heads of equity jurisdiction, and in its exercise the court necessarily receives parol evidence to establish the accident, mistake or fraud, which render its interposition necessary." This decision was made at a general term, and covers the question in this case. It is founded in sound principle, and should be concurred in.

In *Carter* v. *Hamilton,* (11 *Barb.* 147,) it was held that in an action on a note, the defendant could not show that it was given in pursuance of an agreement to give a note, on the purchase of lands, at a certain price per acre, and that the price per acre would be less than the face of the note. The same decision would have been made before *Webb* v. *Rice,* on the ground that the parol evidence was offered to vary the contract ; for the courts recognized the applicability of that rule in all cases, except when the alteration was to convert an absolute deed into a mortgage.

The result is, that neither at law nor in equity can parol evidence be received to show that a deed absolute on its face was agreed to be, or was, a mortgage, when the parties, intended that the deed should be in the form in which it is; but that where there was an agreement to execute a defeasance, or that a mortgage should be executed, and by fraud, accident or mistake this agreement is not carried out, equity will give relief, and necessarily allow parol evidence, to prove the agreement and the fraud, accident or mistake. And, that if a third party sues the apparent absolute assignee and he is not in possession, and his liability in justice would only arise out of his being in possession, the defendant may show that he *held* not as assignee, but as security only.

The plaintiff cannot therefore recover in this case, even if his evidence were more favorable to him. And the orders granting · the injunction and continuing it, should be reversed, with costs below and on the appeal.

[NEW-YORK GENERAL TERM, October 3, 1853. *Edmonds, Edwards, Mitchell, Roosevelt* and *Morris,* Justices.]